**Not for publication**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                    :
RONALD WILLIAMS,                    :
                                    :
                Plaintiff,          :    Civil Action No. 08-1478 (JAP)
        v.                          :
                                    :    **OPINION**
METROPOLITAN LIFE INSURANCE         :
COMPANY, HOME DEPOT U.S.A.,         :
INC., JOHN DOE (1-5) and ABC        :
CORP. (1-5),                        :
                                    :
                Defendants.         :
_____ :

PISANO, District Judge:

Presently before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) in this case involving the denial of long-term disability benefits. Docket Entry No. 34 and 38. For the reasons set forth below, Plaintiff's motion for summary judgment is denied and Defendants' motion for summary judgment is granted.

I.  Background

Plaintiff, Ronald Williams, was employed by Home Depot, U.S.A., Inc. ("Home Depot") as a Sales Manager until August 21, 2004, at which time he stopped working due to injuries sustained in an October 18, 2002 automobile accident. Def. Statement of Uncontested Facts at ¶ 2.[1] Williams sustained various injuries in the October 2002 accident, including injuries to his neck, lower back, and knees. *Id.* at ¶ 16.

While an employee at Home Deport, Williams was covered by a long-term disability ("LTD") insurance policy under the Home Depot, U.S.A., Inc. Long Term Disability Plan (the

___
[1] Unless otherwise noted, Plaintiff does not dispute Defendant's Statement of Uncontested Facts.

1

"Plan"). *Id.* at ¶ 1.  The Plan is governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*  Metropolitan Life Insurance Company ("MetLife") serves as both plan administrator and funding source for the Plan. *Id.*  After leaving Home Depot in August 2004, Williams filed a claim for LTD benefits under the Plan.  The application was accompanied by an Attending Physician Statement by Steven Laskin, M.D. listing Williams' primary diagnosis as polyneuropathy and stating that Williams' ability to sit, stand, and walk was "0" hours. *Id.* at ¶ 17.  Additionally, Dr. Laskin concluded that Williams was not able to carry any weight. *Id.*  MetLife approved Williams' claim with a disability date of August 24, 2004, and Williams began receiving LTD benefits on February 20, 2005. *Id.* at ¶ 2. At the time his claim for LTD benefits was approved, Williams executed an Agreement to Reimburse Overpayment of Long Term Disability Benefits in which he opted to receive his full LTD benefit.  As part of the agreement, Williams represented that he would apply for Social Security Disability benefits and reimburse MetLife for any and all overpaid LTD benefits if he subsequently received Social Security Disability benefits. *Id.* at ¶ 20.  Williams applied for Social Security Disability benefits on February 2, 2005. *Id.* at ¶ 24.

Under the terms of the Plan, Williams was entitled to receive only 24 months of LTD benefits for soft-tissue injuries, unless his disability resulted from one of the following disorders: seropositive arthritis, spinal tumors, vascular malformations, radiculopathies, myelopathies, traumatic spinal cord necrosis, or muscolopathies. *Id.* at ¶ 22; Joint Appendix 0839. Additionally, the Plan terms required Williams' to submit proof of his continuing disability periodically in order to continue receiving LTD benefits under the Plan.  Def. Statement of Uncontested Facts at ¶ 3.

In March 2005, MetLife received a report of nerve condition studies and monopolar needle studies conducted by Peter H. Schmaus, M.D. *Id.* at ¶ 25. The monopolar needle studies were largely unremarkable and Dr. Schmaus concluded

> The above motor and sensory nerve conduction studies reveal amplitudes and nerve conduction velocities at the lower limit of normal. The late responses are somewhat prolonged. Nerve condition studies in the right upper extremity are, however, unremarkable. The monopolar needle study reveals chronic changes in the lower extremities as well as membrane instability at the aforementioned paracervical and paralumbar levels. The above findings are most consistent with a combined picture of cervical and lumbar radiculopathy with chronic features . . . a peripheral neuropathic process. A mild case of left common peroneal nerve entrapment at the fibular head cannot be ruled out.

Joint Appendix at 573-74.

Williams' treating physician, Bernard P. Newman, M.D. wrote to MetLife on October 24, 2005, regarding Williams' condition. *Id.* at 535. In his report, Dr. Newman stated that Williams' mood was normal, he was not distressed, and he was walking "without limp, list or pelvic obliquity." *Id.* However, Dr. Neuman also noted that while Williams' pain and radiculopathy were better, they had recurred in Williams' upper spine. *Id.* Dr. Newman referred Williams for an MRI. *Id.* An MRI was performed on October 28, 2005. *Id.* at 533. The MRI showed that Williams suffered from 1) "mild broad-based disc bulge seen at the L3-4 with mild spinal stenosis," 2) "broad-based disc bulge seen at L4-5 level with mild to moderate spinal stenosis," 3) "… broad-based disc bulge seen at the L5-S1 level. There is mild spinal stenosis present." *Id.*

MetLife requested updated medical records from Williams on February 21, 2006. Def. Statement of Uncontested Facts at ¶ 29. In response, Williams submitted the January 20, 2006 report of Anthony I. Marquinez, M.D. *Id.* at ¶ 30. Despite Williams' complaints of pain, weakness, and difficulty bending, Dr. Marquinez reported that a strength examination revealed:

> shoulder abduction 5/5, arm extension 5/5, arm flexion 5/5, wrist flexon, wrist extension 5/5, hip flexion 5/5, leg extension 5/5, leg flexion 5/5, foot dorsiflexion

3

> 5/5, and plantar flexion 5/5.  Tone is normal.  There is no muscle atrophy.  There are no fasciculations.  There are no tremors or other involuntary movements.  Deep tendon reflexes are as follows 2+ both biceps, 2+ both triceps, 2+ both brachioradialis, 2+ in the right and 1+ in the left quadriceps femoris, unobtainable in both triceps surae.  Plantar responses are flexor.  Ankle clonus is absent.  Finger-to-nose testing and rapid fire movements are normal.  Light touch and pinprick are normally perceived in the arms and legs.
>
> Joint Appendix at 539.

Dr. Marquinez concluded, "I am not certain I understand the specific cause of Mr. Williams neuropathic pain at the present time."  *Id.*

On or about June 29, 2006, Dr. Newman completed an Attending Physician Statement.  *Id.* at 507-09.  Dr. Newman diagnosed Williams as suffering from cervical radiculopathy and lumbar spinal stenosis.  *Id.* at 507.  Dr. Newman opined that Williams was able to sit, stand, and walk for one hour intermittently, and that he could occasionally lift up to 20 pounds.  *Id.* at 508.  Dr. Newman also concluded that Williams was able to perform repetitive fine finger movements with both hands, as well as eye hand movements with both hands.  *Id.*  However, Dr. Newman also opined that Williams was not able to climb, twist/bend/stoop, or reach above shoulder level.  *Id.*  Dr. Newman concluded that Williams was able to work "0" hours per day.  *Id.*

Dr. Marquinez conducted a follow up examination on April 25, 2006.  *Id.* at 515.  The doctor noted that Williams complained of "progressively worsening lower back pain."  *Id.*  Dr. Marquinez reviewed Williams' October 2005 MRI and concluded that he probably was not suffering from "chronic neuropathic pain from persistent injury to the left peroneal nerve" but that he suspected L5 radiculopathy.  *Id.*  On May 10, 2006, Dr. Marquinez conducted motor nerve, sensory motor, F-wave studies, and EMG studies.  *Id.* at 516-17.  The studies showed "no evidence for sensorimotor axonal or demyelinating peripheral neuropathy," "no evidence for left peroneal compression neuropathy at the fibular head," "no evidence for lumbosacral

radiculopathy," and that "[t]he significance of the isolated finding of minimal acute denervation in the right medial gastrocnemius is presently unclear." *Id.* at 517.

MetLife referred Williams' medical records to Vernon Mark, M.D., a neurosurgeon, for review.[2] Def. Statement of Uncontested Facts at ¶ 39; Joint Appendix at 492-96. Dr. Mark did not examine Williams. Pl. Responding Statement of Uncontested Facts at ¶ 40. After reviewing all of Williams' medical records, Dr. Mark diagnosed Williams with lumbar spondylosis with bulging discs at L3/L4, L4/L5, and L5/S1. Joint Appendix at 496. Dr. Mark also stated that recent tests did not support a diagnosis of radiculopathy or neuropathy. *Id.* Dr. Mark concluded that because Williams' neurological examination was normal and he could "shift positions from sitting to standing to walking on an intermittent basis," he should be able to perform sedentary work. *Id.* Dr. Mark restricted lifting to 20 pounds without bending, twisting, climbing, or reaching above shoulder level due to Williams' lumbar spondylosis with bulging discs and mild central stenosis. *Id.*

With the approval of Dr. Newman, his treating physician, Williams underwent a Functional Capacity Evaluation ("FCE") at MetLife's request on December 21, 2006. Def. Statement of Uncontested Facts at ¶ 45-46; Joint Appendix at 476-82, 487. The evaluation was conducted at Kessler Rehabilitation Center. Joint Appendix at 476. The FCE lasted three hours, with pauses of 2-3 minutes between tasks while the evaluator set up the equipment for the next task and documented the scores for the task just completed. *Id.* at 477. Williams requested two additional breaks averaging five minutes each; however he did not exhibit signs of fatigue during the additional breaks. *Id.* During the FCE, Williams complained of increasing pain, with a level of 8/10. *Id.* He did not require emergency medical treatment for his pain. *Id.* The FCE

---

[2] Plaintiff disputes the independence of the physicians who reviewed Williams' records on behalf of MetLife. Pl. Responding Statement of Uncontested Facts at ¶¶ 39, 46.

evaluator found that Williams could lift between 15 and 30 pounds with self-limiting behavior, could sit frequently, stand, work with his arms over his head, and work bent over occasionally.[3] *Id.* at 479.  The evaluator also concluded that Williams could climb stairs frequently, walk frequently, and engage in repetitive squatting occasionally with self-limiting behavior.  However, the evaluator did note that Williams was "unable to sit with weight through bilateral Ischial tuberosity for more than one minute without shifting weight to the opposite side." *Id.* at 480.  The evaluator also tested Williams' grip strength and concluded "combining results of the clinical consistency comparisons, the presence of self-limiting behavior and the three formal consistency cross comparisons of the grip strength data indicates that there is significant evidence of low effort and inconsistent behavior." *Id.* at 481.  The evaluator noted that Williams engaged in self-limiting behavior on 60% of the 15 tasks evaluated. *Id.* at 476.  Motivated clients self-limit on no more than 20% of test items. *Id.*  At the conclusion of the FCE, the evaluator found that Williams was capable of performing light work for an eight hour day based on his individual tolerance for sitting, standing, and walking. *Id.*

MetLife forwarded the FCE report to an independent consultant for an Employability Assessment.  Def. Statement of Uncontested Facts at ¶ 51.  The consultant reviewed selected medical and vocational documents, including the FCE report, as well as Williams' educational and employment histories.  Joint Appendix at 441.  The consultant identified ten occupations that are consistent with Williams' education, experience, and physical limitations. *Id.* at 443.  Of those ten occupations, the consultant considered eight to be "gainful." *Id.*  The consultant also concluded that such occupations exist within a reasonable commuting distance of Williams' home. *Id.*

---

[3] In his Responding Statement of Uncontested Facts Plaintiff denies that the evaluator made the findings detailed above.  The evaluator's findings can be found in the Joint Appendix at 476-82.

On March 16, 2007, MetLife advised Williams that it would no longer pay him LTD benefits because it determined that the medical documentation and FCE conducted by the Kessler Rehabilitation Center no longer support a finding of total disability.  Def. Statement of Uncontested Facts at ¶¶ 53-54.  Williams disputes MetLife's conclusion that the medical evidence and FCE no longer support a finding that Williams is disabled.  Pl. Responding Statement of Uncontested Facts at ¶ 3.

On January 25, 2007, Williams was awarded Social Security Disability benefits with a disability date of April 4, 2004.  Joint Appendix at 165.  In making his decision to award Social Security Disability benefits to Williams, the Administrative Law Judge ("ALJ") appears to have considered evidence of Williams' injuries from the time of his accident in October 2002, through a May 2005 report prepared as part of Williams' Social Security evaluation.  *Id.* at 158-65.  Based upon the medical evidence presented, the ALJ determined that Williams was disabled as defined by the Social Security Act and was entitled to benefits beginning on April 4, 2004.  *Id.* at 165.  The ALJ also recommended "a continuing disability review be carried out within two years" given the medical evidence and Williams' anticipated improvement.  *Id.*  Williams advised MetLife of the favorable outcome on February 13, 2007.  *Id.* at 447.  Williams was awarded $833.00 per month beginning in March 2007, and received a lump sum payment of $19,597.00 on or about March 17, 2007.  *Id.* at Exhibit 2.  Williams, and his wife Susan as co-plaintiff, also settled a personal injury lawsuit related to the October 2002 accident for $175,000.00.  *Id.* at Exhibit 3.

On May 2, 2007, Williams advised MetLife that he was appealing the discontinuation of his LTD benefits.  *Id.* at 150-51.  Williams also provided additional medical records with his notice of appeal.  *Id* at 151.  Williams' file was referred to Peter Freedman, M.D., a Board

7

Certified Orthopedic Surgeon, for evaluation on June 4, 2007. *Id.* at 110-37. Dr. Freedman reviewed approximately 500 pages of medical records spanning from October 18, 2002 through December 22, 2006. *Id.* at 110-11. Dr. Freedman also reviewed the ALJ's opinion awarding Williams Social Security Disability benefits. *Id.* at 111. Dr. Freedman noted several apparent contradictions contained the records supplied. *Id.* at 134. Specifically, Dr. Freedman noted that Dr. Newman's findings, coupled with the ALJ's conclusion that Williams does not have skills transferable to existing jobs, contradict the finding of the FCE evaluator and Williams' treating neurologist Dr. Marquinez. *Id.* Nonetheless, based upon the medical evidence, Dr. Freedman concluded that Williams "would not be disqualified from doing light duty work based on both his back conditions and particularly his advanced symptomatic arthritis in the knee." *Id.* at 135. Dr. Freedman also suggested that a "formal comprehensive independent medical examination" might be appropriate given the complexity of Williams' case. *Id.*

Williams' medical records were also evaluated by Philip Jordan Marion, M.D., a physician Board Certified in both Physical Medicine and Rehabilitation, and Pain Management. *Id.* at 138-42. Dr. Marion reviewed selected medical records dating from October 2002 through February 2007. *Id.* at 139. He did not, however, review the FCE. *Id.* at 141. Dr. Marion also spoke with Dr. Newman on June 11, 2007, at which time Dr. Newman reported that while Williams continued to suffer from back and knee pain, and would likely require knee surgery in the future, he was nonetheless able to perform at a "light duty occupational level" at that time. *Id.* at 140. Based upon his review of the selected medical records and his conversation with Dr. Newman, Dr. Marion concluded that Williams should be "permanently restricted to light duty occupational activities." *Id.* at 141. Dr. Marion also concluded that Williams' condition did not preclude him from "performing a full light duty occupation." *Id.*

8

On June 26, 2007, MetLife notified Williams that it was upholding the termination of his LTD benefits. *Id.* at 99. MetLife based its decision on Williams' diagnosis and "on his functional capabilities related to his symptoms reported by him and substantiated by his health care providers." *Id.* at 100. MetLife relied upon all medical records provided, as well as the reports of its independent experts, the FCE, and the ALJ's decision awarding Williams Social Security Disability benefits. *Id.* at 100-03. MetLife concluded that despite "symptoms related to cervical radiculopathy, neuropathy, and knee pain," Williams was capable of engaging in sedentary occupations, and that such jobs are available in Williams' geographic area. *Id* at 100,102.

II. Standard of Review

    A.    Summary Judgment

A court shall grant summary judgment under Federal Rule of Civil Procedure 56(c) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Which facts are critical or "material" is controlled by the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988). On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. The non-moving party may not simply rest on its pleadings, but must offer admissible evidence that establishes a genuine issue of material fact, *id.*, and not just "some

9

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but rather determine only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

B.      Denial of ERISA Benefits

The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). When the terms of the plan give the administrator fiduciary discretionary authority to determine eligibility, the denial of benefits is reviewed under an arbitrary and capricious standard. *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3d Cir. 1990). When applying the arbitrary and capricious standard of review to a plan administrator's decision to deny benefits under an ERISA plan, the Court may not substitute its own judgment, instead, the Court may "overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (quoting *Adamo v. Anchor Hocking Corp.,* 720 F.Supp. 491, 500 (W.D.Pa.1989)).

When the plan administrator is in a dual role as both evaluator and payor of benefits a conflict of interest necessarily exists. *Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2348 (2008). The conflict created by this dual role does not change the applicable standard of review. *Id.* at 2350. Decisions of conflicted plan administrators are reviewed for abuse of discretion despite the conflict of interest. *Id.* The conflict of interest present when a plan administrator is both the evaluator and payor of benefits is just one of a number of factors courts should consider when deciding if the administrator has abused his discretion. *Id.* When other factors are closely balanced, an administrator's conflict can act as a tie breaker. *Id.* at 2351. The degree of importance attached to the conflict is case specific and is based upon how closely the other factors are balanced. *Id.* Where the other factors are not closely balanced, the existence of a conflict does not imply that the plan administrator has abused his discretion when denying benefits under an ERISA plan. *See Feigenbaum v. Merrill Lynch & Co., Inc.*, 308 Fed.Appx. 585, 587 (3d Cir. 2009).

III.  Discussion

    A.  Denial of ERISA Benefits

To collect benefits under the Plan, an applicant must demonstrate that he is disabled, as that term is defined by the Plan. Disability is defined as

> [D]ue to an injury or sickness, you:
> - require the regular care of a qualified doctor; and
>
> - are unable to perform each of the material duties of your regular job or *any gainful occupation for which you are reasonably qualified*, taking into account your education, training, and experience.

Joint Appendix at 840 (emphasis added).

In addition to demonstrating a "disability," the applicant must also 1) be unable to return to work after an initial 26-week period of disability, 2) continue to be treated by a qualified physician, 3) not be able to engage in any type of activity for pay, and 4) provide MetLife with "a certification with accompanying medical documentation of a disability from [his] attending doctor" before receiving LTD benefits under the Plan. *Id.* It is undisputed that Williams was disabled under the Plan, and was qualified to receive benefits, at the time he initially applied for LTD benefits in August 2004. However, in order to continue receiving LTD benefits under the Plan, Williams was required to provide MetLife with medical documentation evidencing his continued disability periodically. *Id.* at 592. MetLife's continuing review of Williams' medical records revealed that he was no longer disabled under the Plan on March 16, 2007. *Id.* at 438-39.

When challenging the determination of an ERISA plan administrator, the plaintiff bears the burden of establishing that he is disabled under the plan and entitled to continuing benefits. *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 439-40 (3d Cir. 1997). In determining whether the plaintiff has met his burden, courts must examine the record as a whole. *Id.* at 440. The "record" consists of the evidence that was before the administrator at the time benefits were denied.[4] *Id.* In this case, it is undisputed that the Plan grants MetLife, as plan administrator, discretion to determine disability under the Plan. Because MetLife has the fiduciary discretion to determine whether a disability exists, its decision to discontinue Williams' LTD benefits must be upheld unless a review of the record shows the decision to be arbitrary or capricious.[5]

---

[4] Plaintiff has attempted to supplement the record with a letter from his treating physician stating that he is still totally disabled. Because this letter was not part of the record before the plan administrator, this Court will not consider it.

[5] Williams argues that this Court should review MetLife's decision *de novo* because MetLife's dual role as administrator and payor necessarily creates a conflict of interest. As discussed above, such a conflict does not mandate *de novo* review, but instead, should be weighed as a factor when determining whether a decision to deny or terminate LTD benefits was arbitrary and capricious. Because the Court finds that the factors are not closely balanced in this case, the conflict created by MetLife's dual role is of no moment.

MetLife's determination that Williams was no longer disabled under the Plan as of March 16, 2007, is neither arbitrary nor capricious. A review of the record as a whole reveals substantial evidence to support MetLife's decision to discontinue Williams' LTD benefits. In January 2006, Williams was examined by Dr. Marquinez, his treating neurologist. After examining Williams, Dr. Marquinez concluded, "I am not certain I understand the specific cause of Mr. Williams['] neuropathic pain at the present time." Joint Appendix at 539. Additional tests performed by Dr. Marquinez in May 2006, failed to show evidence of a number of disorders that would explain Williams' pain. *Id.* at 517. MetLife did not terminate Williams' LTD benefits based solely upon the opinion of Williams' treating neurologist, however. After receiving Dr. Marquinez's reports, MetLife referred Williams' file to Dr. Mark, a neurosurgeon, for additional evaluation. *Id.* at 492-96. Dr. Mark concluded, after reviewing the file, that recent tests did not support a diagnosis of radiculopathy or neuropathy, and that given Williams' normal neurological evaluation he should be able to perform sedentary work. *Id.* at 496. Williams also underwent a FCE at MetLife's request. *Id.* at 476-82, 487. After a full evaluation, the FCE evaluator concluded that Williams was capable of performing light work for an eight hour day. *Id.* at 476. MetLife then had Williams' FCE reviewed by an Employability Assessment consultant. Def. Statement of Uncontested Facts at ¶ 51. The consultant identified ten light duty and sedentary jobs that Williams was capable of performing consistent with his education, experience, and physical limitations. Joint Appendix at 443. The consultant concluded that such jobs existed within Williams' geographical area. *Id.*

Furthermore, the medical evidence submitted, and the evaluations conducted, as part of Williams' appeal of MetLife's adverse decision also support a denial of continuing benefits.[6]

---

[6] Plaintiff notes that neither of Defendant's medical experts examined him and argues that Defendant's reliance on such "paper review(s)" requires heightened scrutiny. Pl. Br. in Support of Pl. Motion for Summary Judgment at 12-

13

MetLife referred Williams' file to Dr. Freedman, a Board Certified Orthopedic Surgeon, for review. After reviewing the approximately 500 page record and rendering a detailed opinion, Dr. Freedman concluded that Williams' injuries would not preclude him from performing light duty work. *Id.* at 110-37. MetLife also referred Williams' file to Dr. Marion, a physician Board Certified in both Physical Medicine and Rehabilitation, and Pain Management. *Id.* at 138-42. Based upon Dr. Marion's review of selected medical records and a conversation with Dr. Newman, he concluded that Williams was able to perform light duty work. *Id.* at 141. Of particular note, during the conversation between doctors Marion and Newman, Dr. Newman opined that while Williams suffered from back and knee pain, and would likely require knee surgery in the future, he was nonetheless able to perform light duty work. *Id.* at 140.

Williams argues that the ALJ's finding of total disability in his Social Security case renders MetLife's decision to discontinue his LTD benefits arbitrary and capricious. Pl. Br. in Support of Pl. Motion for Summary Judgment at 9. The standards governing disability determinations under the Social Security Act and those under ERISA differ, and an ERISA plan administrator is not bound by a determination of disability under the Social Security Act. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829-32 (2003); *Pokol v. E.I. du Pont de Nemours and Co., Inc.*, 963 F.Supp. 1361, 1379 (D.N.J. 1997). In this case, the ALJ's decision was provided to MetLife's independent medical experts for use in their evaluations, and MetLife

---

13. Plaintiff relies upon *Hession v. Prudential Ins. Co. of Am.*, 307 Fed. Appx. 650 (3d Cir. 2008), a case in which the Court applied a heightened standard of review because it found that a conflict of interest existed where the defendant was both the plan administrator and payor. *Id.* at 652. The *Hession* Court took "a sliding scale approach to address an administrator's possible conflicts, whereby the level of deference is set 'in accordance with the level of conflict.'" *Id.* (citing *Post v. Hartford Ins. Co.,* 501 F.3d 154, 161 (3d Cir.2007)). The *Hession* Court found that "[t]he insurer's heavy reliance on a paper review, when nearly all of the plaintiff's treating physicians had found her disabled, was a procedural irregularity that warranted heightened scrutiny." *Id.* at 654. The Third Circuit has since abandoned the "sliding scale" approach to determining what level of deference to apply to a conflicted plan administrator's denial of benefits. *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). Instead, courts are to apply a deferential standard of review and consider the plan administrator's conflict as one of a number of relevant factors. *Id.* Here, Defendant has not relied upon a "paper review" conducted by its expert while ignoring favorable reports from Plaintiff's treating physicians.

considered the ALJ's decision before deciding to discontinue Williams' LTD benefits.  Joint Appendix at 99-103.  This Court has also reviewed the ALJ's decision granting Williams Social Security Disability benefits and finds that it does not contradict MetLife's decision to discontinue benefits.  The ALJ's decision appears to be based upon medical evidence from October 2002 through May 2005.  *Id.* at 158-65.  There is nothing in the record to suggest that the ALJ reviewed the more recent medical records relied upon by MetLife.  Further, the ALJ's decision anticipates improvement in Williams' condition, and states that Williams' condition will be revisited in two years time.  *Id.* at 165.

Given that MetLife's decision to discontinue the payment of LTD benefits was based not only on its own expert reports but also on the reports and statements of Williams' own treating physicians, this Court concludes that MetLife's decision was not arbitrary or capricious.

Williams' argument that he falls within an exception to the 24 month limitation on payment of LTD benefits for soft-tissue injuries is moot.  The substantial evidence in the record shows that MetLife's finding that Williams is no longer disabled under the terms of the Plan is neither arbitrary nor capricious, and MetLife is not seeking reimbursement for LTD benefits that may have been paid after the expiration of the 24 month benefit period.  It is immaterial whether Williams' specific diagnosis would entitle him to benefits beyond 24 months because, as discussed above, he is no longer disabled under the Plan, and is therefore not entitled to continuing LTD benefits.

      B.      Reimbursement of Overpayments

Williams does not dispute that under the terms of the Plan, and the terms of the Agreement to Reimburse Overpayment of Long Term Disability Benefits (the "Agreement") signed by Williams and his wife on February 8, 2005, he must reimburse MetLife for any

overpayment of LTD benefits resulting from the receipt of Social Security Disability benefits. Joint Appendix at 602, 841. However, in Williams' Responding Statement of Uncontested Facts, he questions MetLife's calculation of the overpayment of LTD benefits. Specifically, Williams argues that "[defendant's] calculations are questionable as defendants do not state how and to what degree said third-party settlement was used in their calculations." Pl. Responding Statement of Uncontested Facts at ¶ 70. The Court has reviewed MetLife's calculations and it does not appear that they considered the third-party settlement in the overpayment calculation. Under the terms of the Plan and the Agreement, Williams is required to reimburse MetLife for any Social Security Disability benefits received. Williams received a lump sum payment of $19,597.00 from the Social Security Administration on or about March 17, 2007, representing disability benefits for the period of October 2004 through February 2007. *Id.* at Exhibit 2. The lump sum payment of $19,597.00 Williams received represented the retroactive disability benefits to which he was entitled less counsel fees incurred in filing his Social Security claim. *Id.* The fees owed to Williams' attorney for filing his Social Security Disability claim were paid directly by the Social Security Administration. *Id.*

MetLife paid Williams a total of $44,005.52 in LTD benefits. Def. Statement of Uncontested Facts at ¶ 70. Williams does not dispute the amount of LTD benefits paid. MetLife claims that Williams was only entitled to receive $21,247.70 in LTD benefits because he received $19,597.00 in Social Security Disability benefits and $175,000.00 in a third-party settlement. *Id.* at ¶¶ 69-70. The difference between the amount of LTD benefits paid to Williams and the amount MetLife now claims he was entitled to is $22,757.82. Yet, MetLife is only seeking reimbursement in the amount of $17,457.82. By the Court's calculation, MetLife would be entitled to recover the $19,597.00 Williams received from the Social Security

Administration as overpayment of LTD benefits under the terms of the Plan and the Agreement. Therefore, MetLife's motion for summary judgment on its counter-claim for reimbursement of overpayment of LTD benefits is granted and judgment will be entered against Williams in the amount of $17,457.82.

IV.  Conclusion

For the reasons above, Plaintiff's motion for summary judgment is denied and Defendants' motion for summary judgment is granted.   An appropriate Order accompanies this opinion.

/s/ JOEL A. PISANO
United States District Judge

Dated: March 11, 2010